IN RE REMOVAL OF WATKINS, CHIEF OF POLICE.

(No. 324—Decided January 26, 1950.)

*Mr. Craig Carnes* and *Mr. Thomas R. Lloyd,* for appellant, Harry Watkins.

*Mr. Robert E. Scott* and *Mr. Harry Johnson,* for appellee, Russell Bean, mayor.

McCLINTOCK, J. This is an appeal on questions of law from a judgment of the Court of Common Pleas of Guernsey County. Russell Bean, mayor of the city of Cambridge, made an order removing Harry Watkins, the appellant herein, as chief of police of Cambridge, to become effective March 4, 1948. The mayor stated the reasons for such discharge and removal as follows: That he was guilty of misfeasance, malfeasance and nonfeasance in office, incompetency,

inefficiency, discourteous treatment of the public and neglect of duty in the particulars set forth in 37 distinct charges. The appellant gave an explanation in writing to each of such charges.

The order of removal of appellant and appellant's explanation of the same were filed with the Civil Service Commission of Cambridge and appellant appealed from the decision of the mayor to the Civil Service Commission of Cambridge.

After a hearing by the civil service commission in relation to such charges, appellant's motion to dismiss certain of the charges was sustained as to charges Nos. 7, 8, 9, 12, 14, 17, 19, 20, 21, 28, 29, 30, 31, 32, 33, 34, 35 and 36. Charge No. 13 was withdrawn by the mayor and was not ruled upon by the commission.

The charges upon which the matter was finally submitted to the civil service commission were as follows:

"1. Chief Harry Watkins did on or about April 22, 1947, destroy or cause to be destroyed ticket summons when he knew or should have known that an inspector of the office of the Auditor of State wanted to see the same.

"2. Chief Harry Watkins did on or about April 22, 1947, and on numerous occasions before said date destroy or caused to be destroyed ticket summons for parking meter violations, which ticket summons said Harry Watkins knew or should have known were the only record of the amounts of money taken in by the police department from said parking meter violators.

"3. Chief Harry Watkins on or about April 22, 1947, and on numerous occasions before said date did destroy or cause to be destroyed ticket summons without first checking said ticket summons with the amount of money paid by the parking meter violators, knowing said ticket summons to be the only record of such payment.

"4. Harry Watkins did on numerous occasions, the specific dates not known to informants, remove money from the parking meter violations can kept in the police desk, and put said money in his pockets and in his personal billfold without counting said money or checking said money against the paid parking meter violations summons.

"5. That Harry Watkins received or as chief of said Cambridge police department, should have received, $163.75 from parking meter violations during the month of March, 1947, that of said amount less than $47 was turned in to the treasurer of said city by said Harry Watkins or the mayor of the city of Cambridge or said mayor's secretary.

"6. That Harry Watkins said to all officers, 'One time the can was $2.50 short and I made it up out of my own pocket. I'm not going to do that no more, after this someone else will make it up.' Said Harry Watkins had not previously mentioned this to any officer, and said Harry Watkins could have easily checked or caused to be checked the amount received from 25c meter violations daily by checking said money with the paid and matched summons tickets."

"10. That Harry Watkins neglected his duty in that no proper investigation on the part of said Harry Watkins as chief of police, or on the part of said police department at said Harry Watkins' direction, was ever made in connection with the following events: The breaking and entering of George White's garage. Breaking and entering of Frank Schick's Buick garage. Breaking and entering Seaman's Appliance Store. Death of Clarence Shreves. Breaking and entering of Commonwealth Loan. Breaking and entering Central Drug Store.

"11. That at least two police officers reported to Harry Watkins that 'Trouble' Perry was illegally

selling intoxicating liquor, that no warrant was issued and no arrest made.''

"15. That Harry Watkins removed the daily report and record books of the police officers so that they can no longer check the past actions of known offenders, that Harry Watkins removed the stubs of traffic violations so that officers can no longer check the frequency of violations or who is delinquent, that said books and stubs were not removed until Robert Drury (state examiner) was in Cambridge.

"16. That Harry Watkins has on numerous occasions used vulgar and obscene language in referring to members of his department.''

"18. That on Thursday, February 12, Harry Watkins caused members of the Cambridge police force to be used to watch certain other members of said Cambridge police force, and in so doing neglected his duties to the city of Cambridge in that during the time said police were so used, a valid police call went unanswered.''

"22. That information was given to Harry Watkins that gambling laws were being violated at McCoul's Pool Room, and no investigation was made by said Harry Watkins.

"23. That information was given to Harry Watkins that minors could buy intoxicating liquor in all permit places except Christine Spaid's in the city of Cambridge; that said Harry Watkins made no investigation of said charges.

"24. That said Harry Watkins delayed an investigation of unlawful conduct on the part of the operators at the Pastime Billiard Hall until such time as the operators ceased their unlawful conduct and removed evidence of such conduct. Said Harry Watkins being fully advised of the nature and extent of such conduct before and during said delay.

"25. Said Harry Watkins directed police officers

not to remove a telegraph ticker from the Pastime Billiard Hall, having been fully informed that said ticker was used in connection with unlawful gambling conducted on the premises of said Pastime Billiard Hall. That said police officers did remove said ticker to the city building as part of the evidence collected during an investigation of unlawful conduct on the part of the operators of said Pastime. Said Harry Watkins negligently permitted the release of said ticker to the Western Union and refused and/or neglected to treat it as the instrument of gambling which he well knew it was being used for in the Pastime Billiard Hall.

"26. That said Harry Watkins caused charges growing out of said investigation of the Pastime Billiard Hall to be disposed of without presenting the evidence required by the arresting officers and any hearing, or before any court.

"27. That said Harry Watkins gave a statement to the Daily Jeffersonian in connection with an investigation of unlawful gambling at the Pastime Billiard Hall, which statement appeared in the October 21, 1947, issue; which article tended to discredit patrolmen Albert Dusz, Vernon Gable, and Herbert Lyons, and the said Harry Watkins said, 'The affair was not a raid.' Said Harry Watkins stated 'The three patrolmen acted on their own accord, said visit was not ordered by headquarters, it was carried out without the aid of a search warrant,' all of which statements tended to discredit said patrolmen in the performance of their sworn duty."

"37. That said Harry Watkins assaulted a citizen of the city of Cambridge in the municipal building of said city, the time not being known to informant. Said Harry Watkins did so by striking said citizen in the face. Said citizen was not at that time nor later arrested in connection with any violation on his part."

The civil service commission, on consideration of the evidence, sustained the removal of the appellant as chief of police. Thereafter appellant appealed to the Court of Common Pleas of Guernsey County and proceedings were had in pursuance to Section 486-17a, General Code, which reads as follows:

"The tenure of every officer, employee or subordinate in the classified service of the state, the counties, cities and city school districts thereof, holding a position under the provisions of this act, shall be during good behavior and efficient service; but any such officer, employee or subordinate may be removed for incompetency, inefficiency, dishonesty, drunkenness, immoral conduct, insubordination, discourteous treatment of the public, neglect of duty, violation of the provisions of this act or the rules of the commission, or any other failure of good behavior, or any other acts of misfeasance, malfeasance or nonfeasance in office.

"In all cases of removal the appointing authority shall furnish such employee or subordinate with a copy of the order of removal and his reasons for the same, and give such officer, employee or subordinate a reasonable time in which to make and file an explanation. Such order with the explanation, if any, of the employee or subordinate shall be filed with the commission. Any such employee or subordinate so removed may appeal from the decision or order of such appointing authority to the state or municipal commission, as the case may be, within ten days from and after the date of such removal, in which event the commission shall forthwith notify the appointing authority and shall hear, or appoint a trial board to hear, such appeal within thirty days from and after its filing with the commission, and it may affirm, disaffirm or modify the judgment of the appointing authority, and the commission's decision shall be final;

provided, however, that in the case of the removal of a chief of police or chief of the fire department or any member of the police or fire departments of a municipality an appeal may be had from the decision of the municipal commission to the Court of Common Pleas of the county in which such municipality is situated to determine the sufficiency of the cause of removal. Such appeal shall be taken within ten days from the finding of the commission."

The courts have on several occasions passed upon the construction of Section 486-17a, General Code, as to the power of the court on appeal.

We find in the case of *Hawkins* v. *City of Steubenville*, 134 Ohio St., 468, 17 N. E. (2d), 641, the syllabus thereof, as follows:

"Upon appeal by a police officer of a municipality, from a decision of a municipal civil service commission affirming an order of a director of public safety removing such police officer, the power of the Court of Common Pleas is confined by Section 486-17a, General Code, to the rendition of a judgment of affirmance or disaffirmance *in toto*, and the court is without authority to modify the same."

Also, in the syllabus in the case of *Kearns* v. *Sherrill, City Manager*, 137 Ohio St., 468, 30 N. E. (2d), 805, we find the following:

"1. Under the provisions of Section 486-17a, General Code, a member of a police or fire department removed from his position has a right of appeal from the order of a municipal civil service commission to the Court of Common Pleas.

"2. The jurisdiction of the Court of Common Pleas in such case is special and limited, by the terms of the statute, 'to determine the sufficiency of the cause of removal.' Where facts which constitute 'sufficiency of the cause of removal' are established by the evidence

and found by the court, the trial judge may not arbitrarily reinstate such officer to his position and restore his emoluments of office from the date of his discharge on the ground that in his opinion the punishment prescribed is too severe and he is without authority to modify it."

From those authorities it is clear that the jurisdiction of the Common Pleas Court in such a case is to find either that the facts constituting sufficiency of the cause for removal are sustained or not sustained, and that the court can only remove said officer or reinstate him.

A *de novo* hearing was had before the Court of Common Pleas in this case, during which hearing the court, as shown by the record, dismissed charge No. 25, and upon completion of the hearing the court in its opinion used the following language: "Those charges to which the commission sustained the motion to dismiss will not be considered by the court for the reason that the court refused to admit any evidence thereon." The court determined that the cause for the removal of appellant, as chief of police, was shown to be sufficient and affirmed the decision of the mayor and civil service commission.

Thereafter the appellant appealed to this court upon questions of law and for his assignments of error says:

"1. That the final order of judgment or decree is not sustained by sufficient evidence, is manifestly against the weight of the evidence, and is contrary to law.

"2. That there were irregularities in the proceedings of the court, apparent bias on the part of the court, and abuse of discretion, by which the appellant was prevented from having a fair trial.

"3. That there were errors of law occurring at the trial and excepted to by the appellant, and namely:

error in the admission of evidence offered by the adverse party and objected to by this applicant; error in the rejection of evidence offered by this appellant; error in overruling the appellant's motion for a new trial; error in overruling the appellant's demurrer to the introduction of evidence of charges numbered six, seven, nine, thirteen, twenty-seven, thirty-two, and thirty-four; error in overruling the motion of the appellant to dismiss all charges made at the conclusion of the plaintiff-appellee's case; error in permitting the introduction of evidence on charges dismissed by or withdrawn before the civil service commission in the city of Cambridge.''

The appellee had the legal right to file assignments of error as to the holding of the court below in dismissing certain charges herein referred to, but did not do so, and this court will give no consideration to the charges so dismissed by the court below. For authority of this we cite Section 12223-21a, General Code, which became effective September 21, 1945:

''Assignments of error may be filed on behalf of an appellee which shall be passed upon by a reviewing court before a judgment or order is reversed in whole or in part. The time within which assignments of error on behalf of an appellee may be filed shall be fixed by rule of court.''

This court has carefully read all the evidence introduced in the court below and carefully examined the exhibits attached to the record.

The record in this case shows that an ordinance was passed by the city of Cambridge on July 1, 1940, relative to parking meters and the penalty for parking in violation of such ordinance. This ordinance provides a penalty of not less than $1 nor more than $40.

The mayor at that time established a rule in regard to violations, and provided that if a ticket was left on any automobile, which was notice that there was a

violation of the parking law, the offender could take this ticket to the police station and upon depositing 25 cents in a tin can there would be no further proceedings relative to such violation. This practice continued from the time such ordinance became effective until the appellant was removed as chief of police. This procedure was neither suggested nor made by the appellant herein, and in fact, the arrangement made, by which 25 cents could be paid as a donation and upon doing this there would be no prosecution, was a complete violation of the ordinance. There was no authority in law or any ordinance under which such procedure could be established.

In a consideration of charges Nos. 1, 2, 3, 4, 5 and 6, we find from the record the following facts: The tickets placed upon the automobiles were brought by the owners of such automobiles to the city hall and they placed 25 cents in a tin can which was closed with paper tape, and it was marked on the ticket paid and left for the chief of police to pick up. No receipts were issued for these payments. The stubs were collected by the chief of police and matched from the officer's tablet, and after the drawer became full of these tickets they were destroyed. This was a custom established and followed by the mayor since the passage of the ordinance relating to violation of parking laws.

After April 1947, a receipt system was established. The record clearly shows that the chief of police on various occasions objected to the system and requested that a receipt system be established. At times members of the fire department would take care of the matter when there was no policeman in the office.

The procedure as to the payment of this donation of 25 cents is very clearly explained by the testimony of a witness whose name is Willetta Frame, which

was that violators could put their quarters in the can in the mayor's office, which can was on the top of his desk. It was available to anyone that came in the office and frequently there would be no one in the office so that anyone could walk in and pick up the can if they wanted to. The examiner from the state auditor's office made no examination relative to these donations until after a receipt system was established. It was the custom, after the drawer became full of these stubs, to destroy them after a checking by the chief of police.

State examiner John Powelson stated that it was not the policy of the city of Cambridge to treat these collections for meter violations as fines, but to co-mingle such funds with parking meter collections. The appellant did not institute this system and was not responsible for its maintenance, and there is evidence in the record that he never removed money from the meter-violation can without checking the money against the meter violation summonses.

We find a very elaborate explanation of the procedure, as shown by the testimony of Willetta Frame, who at one time was clerk to the mayor and is now clerk of council. Since she is a disinterested witness this court gives credibility to her testimony, which testimony is corroborated by patrolman Albert Dusz. There is no substantial evidence that there was any shortage of the money in the can, and if there was any evidence of such shortage, there is no proof as to any one taking money from the can for his own personal use, since at least 100 people had access thereto. The only exception to the shortage relates to $2.50, which shortage was found by the appellant and he made this amount up out of his own pocket. There is no substantial evidence that the appellant herein appropriated for his own use any money from these donations.

As to charge No. 10, we find from the evidence that the appellant herein did investigate the burglary at the Buick Garage, which occurred in June 1947. Two officers were assigned to make an investigation of this burglary and the appellant personally made an examination of the premises to aid him in the investigation and was assisted by a member of the highway patrol.

As to the investigation of the death of Clarence Shreves, the record shows that the appellant personally made an investigation of this case; that he visited the hospital and talked to a witness; and that there is no substantial evidence to sustain any of the various items under charge No. 10.

As to charge No. 11, the record shows that the appellant made an investigation relative to "Trouble" Perry, who was reputed to be a bootlegger. The record shows that some woman informed Lieutenant Carpenter that her husband was buying liquor from "Trouble" Perry, which liquor was being sold illegally by him, and the reason there was no prosecution for illegally selling liquor was due to the fact that the police were unable to secure any evidence of anyone buying liquor from "Trouble" Perry.

As to charge No. 15, the evidence shows that the report books were removed from the place they were formerly kept and placed in the safe by the appellant but were at all times available to officers upon their request. The appellant's testimony in regard thereto is borne out by the testimony of patrolman Lyons, who said that these report books were made available to him when requested of the appellant.

As to charge No. 16, various members of the police department testified that the appellant, at a police meeting on November 9, 1947, used the expression, "If you sons of bitches don't like it you can throw

your badges on the table." Mayor Ross, who was present at this meeting, stated that he did not hear the expression used and never heard the chief swear at any officers individually or as a group, and Veryl Stone, city editor of the Jeffersonian, who was also present at this police meeting, did not state that any such language was used by the appellant at such meeting.

As to charge No. 18, there is evidence in the record that the appellant and a patrolman by the name of Dusz did investigate to determine whether patrolman Gable was not on his beat during his time of duty. This was a perfectly legitimate investigation, for under the rules no patrolman is permitted to be off his beat at any time without permission and patrolman Gable at the time of this investigation was outside his beat while on duty. This court is of the opinion it was the duty of the chief to make an investigation and find out whether a patrolman was outside his beat during his period of duty.

As to charge No. 22, the record shows that the chief did personally instruct officers to investigate complaints that were filed with the department, and on occasions assigned a plain clothes man to check the places, and that McCoul's Pool Room was one of the places to be investigated.

Relative to charge No. 23, the record shows that the appellant specifically instructed officer Harding, who was a plain clothes officer, to make an investigation of the liquor spots in the city, to see that they adhered to the law with respect to the sale of liquor to minors; that patrolman Harding made an investigation and reported to the appellant; and that as a result of Harding's investigation appellant requested members of the police force to watch liquor establishments.

As to charge No. 24, this court finds there is ample

evidence in the record to show that the appellant co-operated with members of the department in arranging a raid on the Pastime Billiard Hall and made a diagram of the pool room; that the raid was called off at the suggestion of patrolman Dusz, who stated he had information that gambling had ceased for the time being; that appellant specifically instructed patrolman Dusz to watch the Pastime and as soon as gambling commenced to make an arrest.

As to charge No. 25, we find that there is some testimony in regard to this charge. However, as we have hereinbefore stated, said charge was dismissed and it was not proper to hear testimony on this charge after the same had been dismissed. However, since evidence was introduced, this court has examined the record and finds that the mayor, before whom this matter was heard, ordered that the ticker be returned to the Western Union.

As to charge No. 26, the operators of the Pastime entered a plea of guilty and there was no reason for the introduction of any evidence. The court made disposition of the ticker.

Charge No. 27 was relative to a statement by appellant to the reporter for the Daily Jeffersonian, found in the paper of Tuesday, October 21, 1947, in which he said:

"Police Visit Place and Cite Seven to Court

"Seven men were under orders to appear in Mayor Vern F. Ross' court, at 10 a. m., Wednesday, after three city policemen 'visited' rooms at the rear of the Pastime pool room, 744½ Wheeling ave., and confiscated materials said to be used in 'playing the horses.'

"Police Chief Harry W. Watkins said the affair was not a 'raid.' The officers, patrolmen Albert Dusz, Vernon Gable and Herbert Lyons, entered the place, saw what was going on, confiscated evidence and cited

the men, described as two operators and five players, into court, the chief said. The three patrolmen acted on their own accord, Chief Watkins stated. The visit was not ordered by headquarters and it was carried out without the aid of a search warrant, according to the chief.''

It is the opinion of this court that that was an indiscreet statement by the appellant. However, he made a statement, printed in the Jeffersonian two days later, on October 23, 1947, in which he used the following language:

''Law Enforcement Head Declares He Is 'Against All Gambling.'

''Declaring that he is 'against all types of gambling,' Police Chief Harry W. Watkins said Thursday that his statement earlier this week regarding the citation of Pastime pool room operators for promoting a scheme of chance was misconstrued by a number of Cambridge citizens.

''It is the duty of all members of the Cambridge police department to make periodic checks on pool rooms and other establishments to determine whether the law is being violated, Chief Watkins said, and it was one of these visits that disclosed the scheme operating at the Pastime.

''Because I said 'the visit was not ordered by headquarters' I received about ten telephone calls asking me if I was in favor of gambling, the chief stated. I am not in favor of gambling in any form and, furthermore, it is not necessary for a raid, or visit, or whatever it may be called, to be ordered by headquarters.

''Patrolmen Albert Dusz, Vernon Gable and Herbert Lyons acted on their own initiative by visiting the Pastime. They were doing their duty, and in the future the same practice will be followed whether or not the orders originate in headquarters. If an offi-

cer sees a holdup or any other crime being committed, he doesn't wait for orders from headquarters. The same action applies to gambling.''

By reason of this second statement of the appellant, we do not believe that he intended in any way to discredit the patrolmen in the performance of their duty.

As to charge No. 37, relative to an assault made by the appellant, we find by the record that a man by the name of Sherrard was mayor at that time. This incident occurred in 1940. This court can not conceive of the appellant slapping the face of Frank Clark without some cause. In an examination of the testimony, it is disclosed that Frank Clark had a considerable police record and had served time in the penitentiary, and the appellant herein thought that Clark was about to attack the mayor when he slapped him on the face. This court is of the opinion that that would be a reasonable act on the part of the appellant to prevent Frank Clark from assaulting the mayor.

There is some evidence in the record as to fishing poles and fishing tackle found in the private office of appellant, which appellee claims was taken from a stolen car and kept by appellant. None of the charges against the appellant before the Court of Common Pleas makes any claim about the action of appellant in regard to these articles and should not have been considered by the Court of Common Pleas. However, since mention is made about it in the brief of counsel for appellee, this court, upon examination of the record, finds that appellant once wrote a letter to the owner of said stolen car, about the contents thereof, and received no reply from him. It would seem to us that if appellant intended to keep this property he would have taken it to his home, as it is customary to keep the property belonging to other people in the

office of the chief of police until the owner proves his title to such property.

We find from the record that these charges against the appellant were prepared by various members of the police department, who were dissatisfied with conditions. The rules and regulations of the police department, which are a part of this record, provide that if any member of the police force has a grievance, he shall specifically state it to the chief of police. The mayor, who removed the appellant, admits in his testimony that he did not have personal knowledge of all the charges and that he received the charges from the members of the police department, who were dissatisfied with conditions.

Prior to the charges being filed against the appellant, seven of these policemen filed their resignations, to become effective upon a certain date, but after the charges were filed against the appellant they withdrew their resignations.

It is apparent from this record that gambling has been a matter of controversy. The mayor, safety director, chief of police and members of the police department are jointly responsible for the enforcement of the law in the city of Cambridge. Gambling has become a national racket. The United States Senate has recognized this fact and is about to make an investigation in regard to it. The government in the city of Los Angeles has almost broken down by reason of the racketeering in gambling operations.

If the judgment of this court is unreversed it is our suggestion that the members of the police department, the safety director, the mayor and the appellant herein forget the past and jointly co-operate in the enforcement of the laws, keeping in mind that no individual, class, or group, can rightly claim to be immune from the law.

In conclusion, it is the opinion of this court, from a complete examination of this record, that there is some evidence of inefficiency on the part of the appellant, but there is not sufficient evidence of a substantial and probative nature to support the charges made against him or to justify his removal from office.

For these reasons the judgment of the Court of Common Pleas is reversed and it is the order of this court that the appellant be reinstated as chief of police of the city of Cambridge and that he be restored to all legal rights he has lost by reason of his removal.

*Judgment reversed.*

MONTGOMERY, P. J., and PUTNAM, J., concur.